UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/3/2022

-------------------------------------------------------------------X

SING FOR SERVICE, LLC D/B/A MEPCO,      :
                                        :
                          Plaintiff,    :
                                        :            1:20-cv-5617-GHW
                                        :
              -against-                 :
                                        :            MEMORANDUM OPINION
                                        :                AND ORDER
DOWC ADMINISTRATION SERVICES, LLC,      :
                                        :
                          Defendant.    :
-------------------------------------------------------------------X

GREGORY H. WOODS, District Judge:

## I.    INTRODUCTION

DOWC Administration Services, LLC ("DOWC") administers extended vehicle warranties. In 2019, DOWC entered into a transaction with SING for Service, LLC, doing business as Mepco ("Mepco" or "Sing"). Mepco was to provide financing for purchasers of the extended warranties administered by DOWC. It did so by entering into payment plan agreements with the purchasers, permitting them to pay for their extended warranties over time. DOWC failed to include covenants in its agreements requiring that Mepco provide a minimal level of service to purchasers; it also failed to obtain a commitment from Mepco to use any particular form of payment plan agreement with its sellers—instead, the transaction documents contemplated that Mepco would create its own form agreements and provide them to the purchasers of extended warranties without prior review by DOWC.

Mepco is alleged to have provided bad customer service, causing some purchasers to terminate their extended warranties. The cancellations harmed DOWC and 18W Holdings, Inc. d/b/a 1-800 Warranty ("18W"), which sold the extended warranties. DOWC tried to get Mepco to improve, but when it failed to do so, DOWC attempted to terminate the payment plan agreements entered into between Mepco and the purchasers of the extended warranties. Mepco refused—

pointing out that DOWC was not a party to the contracts that it sought to terminate and that it had

no contractual rights to cause Mepco to terminate them.  This action for declaratory judgment

followed:  both Mepco and DOWC seek guidance regarding the scope of DOWC's rights to

terminate the payment plan agreements entered into between Mepco and purchasers of the extended

vehicle warranties.

DOWC presents a number of arguments to imbue its agreements with rights that it failed to

negotiate.  It relies heavily on extrinsic evidence of an unexecuted document presented to it over a

year before the deal closed, and penumbral language in the recitals to its agreement with Mepco.

Because DOWC is not a party to the agreements which it seeks to terminate, and DOWC did not

negotiate covenants permitting it to terminate those agreements, DOWC's claim for declaratory

judgment must be dismissed.  DOWC's claims for breach of the implied covenant of good faith and

fair dealing are dismissed because DOWC stretches the doctrine too far in an effort to add

substantive provisions to the agreements that it failed to negotiate.

## II.   BACKGROUND

### a.   Facts[1]

#### 1. Extended Warranties In General

This case involves extended vehicle warranties and the process by which they are sold,

administered, and financed.  Amended Counterclaims, Dkt. No. 48 (the "Counterclaims").[2]  In the

industry, extended warranties are referred to as "vehicle service contracts."  Vehicle service contracts

---

[1] Unless otherwise noted, the facts are taken from DOWC's Counterclaims, and, where DOWC has admitted to facts pleaded in the Amended Complaint, the Amended Complaint, and their respective attachments, as applicable, and are accepted as true for the purposes of this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[2] The operative version of the Counterclaims, Dkt. No. 48, refers to attached Exhibits A-C, but those documents were not attached to the Counterclaims.  The prior iteration of DOWC's answer and counterclaims, filed on November 4, 2020, Dkt. No 29, does attach those documents.  For purposes of this motion, the Court understands that DOWC's references to Exhibits A-C in the Counterclaims are referring to the documents attached to its November 4, 2020 filing.

"provide additional protection for automobiles either by supplementing an existing factory warranty or by extending protection beyond the expiration of a factory warranty."  Am. Compl., Dkt. No. 8 ("AC"), ¶ 6; Answer, Dkt. No. 48 (the "Answer"), ¶ 6.  Vehicle service contracts are sold by "sellers," who receive a commission for each sale.  The car owners who purchase an extended warranty are referred to as "purchasers."  Purchasers of vehicle service contracts can either pay for them fully upfront, or in installments.  Counterclaims ¶¶ 13, 14, 16.

DOWC is an administrator of vehicle service contracts.  *Id.* ¶ 11.  The service contracts administered by DOWC "are offered to customers through automobile dealers and third-party Sellers, such as 18W Holdings, Inc. (d/b/a 1-800 Warranty) ('18W')."  *Id.* ¶ 12.  "DOWC and its Sellers have complete discretion whether to offer payment plan services to their customers and whether to rely on a third-party vendor for collecting monthly payments from customers."  *Id.* ¶ 13.  Around January 2019, DOWC selected Mepco to provide "payment plan services for purchasers of Service Contracts administered by DOWC."  *Id.* ¶ 14.  In that role, Mepco essentially acts as a lender:  it pays DOWC and the relevant seller lump payments for service contracts that it agrees to finance.  In exchange, it receives installment payment over time from the purchaser of the vehicle service contract.  *See generally* Administrator Agreement, Dkt. No. 8-1 (the "Administrator Agreement"), ¶ 2.

### 2. Service Contracts

The relationships between the purchasers, sellers, DOWC, and Mepco are governed by a series of interrelated contracts.  Counterclaims ¶ 15.  At the core of each transaction is a vehicle service contract, which "is the primary agreement that outlines the parties' relationship."  *Id.* ¶ 16. "When a customer purchases a Service Contract, the Seller, here 18W, enters the information about the customer and the vehicle in Inline, a cloud-based electronic customer relationship management (CRM) platform."  *Id.* ¶ 18.  Then, "Inline CRM generates the relevant documents for the

customer's review and approval." *Id.* DOWC provides the template form of service contract to Inline CRM, which it uses to generate an individualized service contract for each customer and her vehicle. *Id.* ¶¶ 18, 19.

The service contracts themselves are straightforward: they identify the buyer, her vehicle, the contract price, and its duration. Form of Service Contract, Dkt. No. 29-1, Ex. B (the "Service Contract"). The Service Contract describes the maximum amount of liability under the contract and outlines the scope of coverage provided by the warranty. *Id.* The Service Contract permits both the relevant purchaser and DOWC to cancel the contract under specified circumstances. The purchaser has the right to cancel the contract at any time. *Id.* ¶ 4. If the purchaser does so, she is entitled to a pro-rata refund of the payment that she made to purchase the contract: DOWC is obligated to make that payment. *Id.*

The only parties to the Service Contract are DOWC and the relevant purchaser.[3] *Id.* ¶ 10. The Service Contract does not contain any reference to Mepco or any other financing source. Nor does it refer to any other agreements between DOWC, Mepco, or any other parties. It does, however, contain an integration clause that reads as follows: "This Service Contract represents the entire agreement between You and Us. . . . No other written or oral statements apply to this Service Contract." *Id.* ¶ 11. In sum, the Service Contract defines the general structure of the extended warranty coverage provided to the purchaser, but the agreement itself has nothing to say regarding the relationship between the purchaser and Mepco, or between Mepco and DOWC. To the contrary, the integration clause expressly disclaims the existence of other agreements that apply to the Service Contract.

---

[3] While the Service Contract contains a signature block for the purchaser, there is no signature block for the seller, or the administrator of the Service Contract. In the template Service Contract provided to the Court in connection with this motion, no party signed the Service Contract.

### 3. Payment Plan Agreements

When a purchaser chooses to pay for her service contract in installments, she receives a payment plan agreement "that outlines the terms specific to the payment schedule." Counterclaims ¶ 20. This document is also generated for the purchaser by Inline CRM. Significantly, for the purpose of understanding the disconnect that led to this dispute, Mepco provides the template payment plan agreements directly to Inline CRM for distribution to purchasers. *Id.* ¶ 18. "DOWC does not have access to the forms Mepco provides to Inline CRM or signed Payment Plan Agreements in the Inline CRM." *Id.* ¶ 19.

The payment plan agreement used by Mepco to finance the service contracts at issue in this case states expressly that it is entered into between Mepco and the purchaser of the relevant service contract. Form of Payment Plan Agreement, Dkt. No. 29-1, Ex. B (the "Payment Plan Agreement").

> This Payment Plan Agreement ("Agreement") is between Purchaser and SING For Service, LLC d/b/a/ Mepco ("MEPCO"), a Seabury Asset Management Company. Purchaser has purchased a service contract ("Contract") from Seller that is issued by DOWC Administration Services ("Administrator"). This Agreement is entered into to enable Purchaser to pay for the Contract pursuant to an installment payment program.

Payment Plan Agreement at 1. The Payment Plan Agreement sets out the aggregate purchase price for the underlying contract and breaks the purchase price down into a number of installment payments. *Id.* The Payment Plan Agreement lays out the obligations of the purchaser with respect to the payments due: "Purchaser has paid to Seller for its account in cash the down payment disclosed . . . . The Balance of Sales Price shall be paid by Purchaser to MEPCO." *Id.*

The Payment Plan Agreement provides the purchaser the right to cancel the contract at any time. *Id.* at 2 ("PURCHASER SHALL HAVE THE RIGHT, AT ANY TIME, TO CANCEL THE CONTRACT BY NOTICE TO MEPCO . . . OR BY NONPAYMENT. PURCHASER SHALL HAVE NO OBLIGATION TO MAKE ANY INSTALLMENT PAYMENTS AFTER

CANCELLATION.""); *see also id.* at 3.  Similarly, Mepco retains the authority to terminate the contract under certain circumstances, in particular if the purchaser fails to make a payment or another event of default occurs under the contract.  *Id.* at 3.  The Payment Plan Agreement provides Mepco a number of important rights, presumably designed to secure its opportunity to obtain repayment of the money that it advances.  Among other things, under the agreement, the purchaser "assigns to MEPCO all of Purchaser's right, title and interest in and to the Contract and all proceeds thereof, including Purchaser's rights to receive all unearned and return amounts." *Id.*  Mepco is also designated as the purchaser's attorney in fact to cancel the underlying service contract and to demand and collect amounts relating to it.  *Id.*

The Payment Plan Agreement is governed by New York Law.  *Id.* at 4.  The Agreement is made solely between the purchaser and Mepco.  It contains no provisions that purport to give any rights to DOWC regarding the contract or its administration.  There is no language in the Payment Plan Agreement that gives DOWC the right to terminate the agreement or to replace Mepco as a party to it.

### 4.  The Dealer Agreement

Mepco has entered into a "Dealer Agreement" with 18W, the seller of the service contracts at issue in this case.  Counterclaims ¶ 17.  The parties to the Dealer Agreement are Mepco and 18W; DOWC is not a party to the agreement.[4]  Dealer Agreement, Dkt. No. 29-1, Ex. A (the "Dealer Agreement"), at 1.  The Dealer Agreement outlines the relationship between Mepco and 18W.  The Dealer Agreement defines a "Payment Plan Agreement" as "the instrument or document provided by SING pursuant to which the Purchaser of a Service Contract agrees . . . to make payments on a period basis toward the purchase price of such Service Contract."  Dealer Agreement ¶ 1(b).  The

---

[4] Some provisions of the Dealer Agreement refer to the "Administrator," but that term is not defined to refer specifically to DOWC, but, rather, to "any person or entity that either administers a Service Contract sold by Dealer and/or is the obligor of any such Service Contract."  Dealer Agreement at 1.

agreement does not limit the definition to a particular form of agreement, and it provides that Mepco has the authority to provide the form of contract to be used.  *Id.*; *see also id.* ¶ 2(a) ("Dealer shall offer Service Contracts with an installment payment plan . . . to Purchasers only on forms . . . which have been provided by SING . . . .").  The Dealer Agreement also makes plain that only Mepco has rights in the payment plans into which it enters; 18W expressly disclaims any interest in the agreements.  Dealer Agreement ¶ 13(m).[5]

In broad outline, under the Dealer Agreement 18W can offer installment payment plans to its purchasers, using the payment plan agreement forms provided to it by Mepco.  *Id.* ¶ 2.  Mepco evaluates applications for payment plan agreements, and has the right to either accept or deny any proposed payment plan agreement "in its sole discretion."  *Id.* ¶ 3.  If Mepco agrees to enter into a payment plan agreement with one of 18W's customers, Mepco is entitled to receive a $250 fee (the "Discount Fee"), 50% of which is earned when the purchaser makes its first installment payment. *Id.* ¶ 2(b); *id.* Ex. A.  The remainder is earned when the purchaser makes its second installment payment.  *Id.*  The Discount Fee is withheld from the payment made by Mepco to the Dealer.  *Id.*

When Mepco enters into a payment plan agreement with one of 18W's customers, Mepco "will typically provide funding to Dealer's Administrator(s), such funding herein characterized as Dealer Cost; and to Dealer or its overhead services provider . . . , such funding herein characterized as Dealer Profit."  *Id.* ¶ 4.  So, subject to various holdback provisions, Mepco pays the 18W an amount described as 18W's "profit" early in the term of a payment plan agreement.[6]

---

[5] "Dealer acknowledges and agrees that title to all Payment Plan Agreements and all amounts owing by a Purchaser pursuant to any Payment Plan Agreement shall at all times be vested in SING and its assignees, and Dealer shall have no right, title, or interest in any Payment Plan Agreement or any such amounts."  Dealer Agreement ¶ 13(m).
[6] Interestingly, the Dealer Agreement does not specify the amount of the "Dealer Profit" that Mepco is required to fund.  Mepco "will submit funding to Dealer or Dealer's overhead services provider as may be directed by Dealer or Dealer's overhead services provider as may be directed by Dealer in its sole discretion."  Dealer Agreement ¶ 4.

The Dealer Agreement permits Mepco to terminate any payment plan agreement.  *Id.* ¶ 7
("SING has the right to terminate a Payment Plan Agreement at any time and from time to time.").
The Dealer Agreement requires that in the event of any such a termination, 18W, as dealer, make a
refund payment to Mepco.

> In the event that a Payment Plan Agreement is canceled for any reason, Dealer shall
> be obligated to refund SING the following amount:  (1) the amount funded by
> SING; plus (2) any late payment charges due to SING; less (3) payment SING
> received from the Purchaser; less (4) any amounts received by SING from
> Administrator(s) with respect to the canceled Payment Plan Agreement.

*Id.*  While 18W is directly responsible for the repayment of those refund amounts, the Dealer
Agreement authorizes Mepco to collect any amounts owing to it by Dealer from any of its
administrators.  *Id.* ("In the event that SING does not receive the Refund Amount within 90 days
following the date any Payment Plan Agreement is canceled, Dealer hereby authorizes
Administrator, upon notice from SING, to remit such amount directly to SING out of any funds
due Dealer from Administrator.").

The Dealer Agreement has an odd governing law provision:  it is to be "construed in
conformity of the laws of the State of Illinois without regard to choice of law or conflict of law rules
should SING bring legal proceedings against SELLER, but New Jersey law in the event SELLER
brings legal proceedings against SING."  *Id.* ¶ 13.  The agreement is terminable by either party on 30
days written notice.  *Id.* ¶ 8.  The Dealer Agreement does not contain any language granting rights to
DOWC or any third party in connection with the agreement or any payment plan agreement or
service contract.[7]  The Dealer Agreement specifically provides that it is "entered into between

---

[7] The Dealer Agreement contains a clause entitled "Entire Agreement" that seems intended to be an integration clause,
but that, for those familiar with the customary purpose and language of integration clauses, may seem to be very oddly
formulated:  "This Agreement, together with any policies, procedures, documents, notice, or other evidence of any kind
related to SING's requirements, policies, and procedures for the Payment Plan Program or any aspect of the Payment
Plan Program, contains the entire agreement between the parties regarding its subject matter and supersedes any
previous and contemporaneous negotiations, representations, and agreements between the parties . . . ."  Dealer
Agreement ¶ 13(j).

Dealer and SING for the exclusive benefit of SING and its successors and assigns and is expressly not intended for the benefit of any other person or entity." *Id.* ¶ 13(h).

### 5.  The Administrator Agreement

On January 1, 2019, DOWC and Mepco entered into the Administrator Agreement.  AC ¶ 16; Answer ¶ 16.  The Administrator Agreement describes the obligations of DOWC and Mepco with respect to the payment plan program operated by Mepco.  The Administrator Agreement begins with a "Background" section, which precedes the section of the agreement entitled "Agreement."  The Court emphasizes the fact that these two portions of the agreement are separate and distinct because DOWC's arguments fail to recognize that, despite their clear labels, the language in the "Background" section contains non-substantive recitals, and that the parties' agreements are contained in the section labelled "Agreement."

The "Background" section of the agreement contains what are, in essence, recitals.  It describes the purpose of the agreement prefatory to the definite terms of the parties' agreement.[8]  As its introductory language makes clear, the "Agreement" section of the Administrator Agreement lays out the specific terms of the parties' agreement.  *Id.* ("Agreement  Therefore, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, SING and Administrator agree as follows:").

The Administrator Agreement contains specific provisions governing "Service of Accounts" described under a heading of that name.  Administrator Agreement ¶ 2.  "Each Account shall be

---

[8] Administrator Agreement at 1  ("Background  SING is in the business of servicing payment plan programs for sellers and administrators of Service Contracts.  Administrator is in the business of administering Service Contracts sold by various third party Sellers (or, in some cases, by Administrator).  Administrator would like the ability to allow Purchasers to pay for a Service Contract on a monthly basis, subject to Purchaser's right to cancel the Service Contract and related Payment Plan Agreement and receive a refund from Administrator of any unearned payments.  To this end, SING will enter into Payment Plan Agreements with Purchasers, which will allow Purchasers to pay for the Administrator's Service Contracts on a monthly basis, subject to such cancellation rights . . . .  The parties are entering into this Agreement to agree on the terms and conditions upon which SING will support and service the Administrator's Payment Plan Program.") (emphasis added).

serviced in accordance with this Section." *Id.* Mepco has the right to accept or reject any account "for any reason (or no reason) in its sole discretion." *Id.* The agreement requires that DOWC provide Mepco certain information whenever a purchaser enters into a payment plan agreement. *Id.* ¶ 2(b). That information includes the "fully-completed Payment Plan Agreement, duly executed by Purchaser, or such other documentation as specified from SING," and certain financial information related to the contract. *Id.* When Mepco does decide to accept an account, it pays the Administrator the "Seller Cost"—which is a portion of the sales price for the service contract, less any down payment to which the Administrator is entitled. *Id.* ¶ 2(c); *id.* App'x A. And Mepco also pays the relevant seller its "Seller Profit." *Id.* ¶ 2(d). As a result of those payments made by Mepco upon acceptance of a payment plan agreement, DOWC and the seller, here 18W, receive the payments for which they are entitled upon the sale of a contract upfront. Mepco is repaid those amounts over time by the purchaser pursuant to the payment plan agreement with the purchaser.

The Administrator Agreement makes very clear that the Administrator is responsible for the administration of service contracts with purchasers. *Id.* ¶ 2(g) ("Administrator shall solely and exclusively administer, service, and maintain the Service Contracts. . . . SING shall have no responsibility, liability, or obligations with respect to the administration, service or maintenance of any Service Contract or any of Administrator's obligations under this Agreement."). Similarly, the Administrator Agreement states that Mepco does not have an interest in the contractual relationship between the Administrator and 18W, the seller of the service contracts at issue in this case. *Id.* ¶ 2(b) ("SING has no involvement in the contractual relationship, economic or otherwise, between Administrator and Seller . . . .").

DOWC, as Administrator, is financially liable to pay any amount required to be refunded to a purchaser upon the termination of a payment plan agreement. *Id.* ¶ 2(g) ("Administrator shall be solely and wholly responsible for refunding to each Purchaser all amounts required to be refunded

or paid to Purchaser upon any cancellation of the Payment Plan Agreement or related Service Contract.")  Under the terms of the agreement, DOWC's obligation to pay purchasers that refund amount is not limited by any contingency—regardless of whether the payment plan agreement is terminated unilaterally by Mepco or the relevant purchaser, it must pay.  Similarly, and significantly for purposes of this litigation, DOWC must pay even if a purchaser terminates a payment plan agreement because she is unhappy with the quality of the service provided by Mepco.

As noted, Section 2 of the Administrator Agreement states that all of the accounts "shall be serviced in accordance with this Section."  *Id.* ¶ 2.  Nowhere in Section 2, however, are there provisions that require that Mepco take any action with respect to the accounts that it accepts.  In particular, there are no provisions that require Mepco to provide any level of service to purchasers of payment plan agreements.  They are not required, for example, to maintain a website, to return calls from purchasers within a certain amount of time, or to provide any other type of service to purchasers—the section of the Administrator Agreement establishing the terms upon which the accounts "shall be serviced" contains no such obligations.

The Administrator Agreement contains a provision governing cancellation of payment plan agreements.  Section 3 of the Administrator Agreement, titled "Cancellation," provides for "Cancellation by SING" and "Cancellation by Purchaser."  *Id.* ¶¶ 3(a)–(b).  There is no provision in the Administrator Agreement that expressly permits DOWC to cancel a payment plan agreement. The Administrator Agreement provides that in the event that Mepco terminates a payment plan agreement as a result of a default, Mepco can immediately cancel the agreement by notice.  "Upon receipt of such notice, Administrator shall cancel the related Service Contract . . . and pay to SING the Refund Amount in accordance with this Agreement."  *Id.* ¶ 3(a).  If the administrator or any seller of a service contract receives notice that the purchaser is cancelling her contract, DOWC is

required to "immediately notify SING in writing of such Purchaser's cancellation . . . and . . . pay to SING the Refund Amount in accordance with this Agreement." *Id.* ¶ 3(b).

Section 4 of the Administrator Agreement outlines the parties' "Representations, Warranties and Covenants." *Id.* ¶ 4. Subpart (a) contains a number of mutual covenants and representations made by both Mepco and DOWC. *Id.* ¶ 4(a). Subpart (d) generally requires both parties to the agreement to comply with the federal Electronic Funds Transfer Act and Regulation E. *Id.* ¶ 4(d). There are no other covenants that apply to Mepco. All of the other representations and covenants are made by DOWC to Mepco. *Id.* ¶ 4(b)–(c). So, there are limited covenants in the agreement that run from Mepco to DOWC. None relate to the quality or nature of the service to be provided by Mepco to purchasers or the terms of the payment plan agreements that it enters into with them.

The Administrator Agreement is governed by New York law. *Id.* ¶ 8(a). The agreement bars DOWC from assigning its rights under the agreement to others without Mepco's consent, but provides Mepco broad flexibility to "pledge its contract rights hereunder and any collateral documentation arising therefrom" to any financing source supporting the payment plan program. *Id.* ¶ 8(d). Like the Dealer Agreement, the Administrator Agreement states that it is entered into between the parties "and is expressly not intended for the benefit of any other party." *Id.* ¶ 8(h). Also like the Dealer Agreement, the Administrator Agreement contains a cost-shifting clause, which provides that in the event of litigation between the parties, the prevailing party is entitled to reimbursement of "all costs and expenses, including, without limitation, reasonable attorneys' fees." *Id.* ¶ 8(e).

The events leading to this litigation are best understood with this contractual matrix in mind. As the counterclaims assert, the relationship between the parties is governed by this set of documents. Mepco provides payment plans to purchasers of extended warranties who contract with DOWC. DOWC is on the financial hook to repay purchasers and Mepco in the event that a service

contract is terminated early.  But the agreements do not expressly provide DOWC with any right to control the terms of Mepco's contracts with purchasers, or Mepco's relationship with purchasers. The lack of consideration of those issues in the parties' documentation left DOWC little contractual leverage in the event of a dispute with Mepco.  Of course, just such a dispute arose.

### 6.  DOWC Becomes Concerned About the Quality of Mepco's Services

"In late 2019 – early 2020, DOWC learned that Mepco was not responsive to customers, and made false and defamatory statements about the Service Contracts administered by DOWC and the Sellers that offer Service Contracts administered by DOWC."  Counterclaims ¶ 41.  "In addition, DOWC became aware of several instances of credit card chargebacks and questioned Mepco about the steps it took to support the charges for the Service Contract . . . ."  *Id.* ¶ 42.  These deficiencies were meaningful to DOWC because "[a]s a payment plan servicer, Mepco is expected to promptly respond to inquiries from customers, update the payment method when needed, and provide an explanation and supporting documentation when a purchaser questions or disputes monthly charges for the Service Contract."  *Id.* ¶ 40.[9]  "The value of a payment processor's services in large part depends on its ability to provide efficient service and represent the Administrator's and the Seller's interests with integrity."  *Id.*  DOWC believed that Mepco's lack of care or negligence in servicing DOWC's customers contributed to a higher rate of cancellations of service contracts by purchasers. *Id.* ¶ 47.

DOWC alleges that Mepco has a financial incentive to induce purchasers to terminate service contracts early as a result of the fee structure established by its contracts.  *Id.* ¶ 46.  That is because, as described above, "[u]nder the Dealer Agreement with 18W, Mepco earned $125.00 at the time the purchaser made the first monthly payment and the remaining $125.00 was earned when the

---

[9] As noted above, despite their alleged importance, DOWC did not choose to lay out any of these expectations in any of the governing contracts.

purchaser made the second payment." *Id.* ¶ 44.  Thus if "a purchaser defaults or cancels the Payment Plan Agreement and/or the Service Contract after making two monthly payments, Mepco has earned its fee and is entitled to receive a prompt refund for the funding advanced.  Once the refund is processed, Mepco is made whole and actually benefits from having shortened the duration of its advance to the Seller and Administrator . . . ." *Id.* ¶ 46.

In addition to Mepco's alleged failure to provide adequate service to customers, "in or around March 2020, DOWC learned that Mepco had withheld the funding for DOWC contracts sold by 18W, one of the largest Sellers of DOWC's contracts.  DOWC became aware that Mepco failed to fund 18W without notice or adequate justification, which greatly harmed 18W, DOWC's crucial business partner." *Id.* ¶¶ 48–49.[10]  These concerns continued over the course of several months in early 2020 without remedy, leading DOWC to act.  *Id.* ¶ 50.

### 7. DOWC Attempts to Terminate Mepco's Payment Plan Agreements

As a result of its concerns with Mepco's services, DOWC decided that "it was necessary to sever its relationship with Mepco with respect to Service Contracts sold by 18W." *Id.* ¶ 52.  "On or around July 13, 2020, DOWC notified Mepco that it was terminating Mepco's services with respect to Service Contracts sold by 18W.  DOWC explained that it no longer wanted Mepco to serve as DOWC's agent in connection with listed Service Contracts.  As a result, DOWC instructed Mepco that it may not administer or process any payments for the listed Service Contracts." *Id.* ¶ 53. DOWC informed Mepco that DOWC would pay Mepco the amount that it had advanced for the relevant contracts "in normal course." *Id.* ¶¶ 54, 69–71.

---

[10] As noted above, the Administrator Agreement permits Mepco to decline any account "for any reason (or no reason) in its sole discretion."  Administrator Agreement ¶ 2.  DOWC's assertions in its counterclaims that Mepco failed to provide "adequate justification" for failure to enter into payment plan agreements do not engage with this provision of the parties' negotiated agreement.

Mepco refused to comply with DOWC's unilateral demand that it cancel its payment plan agreements. *Id.* ¶ 64. As described above, and as DOWC acknowledges, the Administrator Agreement is "silent regarding DOWC's right to cancel Mepco's services in connection with existing Service Agreements." *Id.* ¶ 56. As a result, in the absence of contractual language requiring that it do so, Mepco took the position that DOWC did not have the right to terminate contracts that Mepco had entered into bilaterally with purchasers.

DOWC also "specifically demanded that Mepco cease and desist from charging or billing 18W's customers simultaneously for Service Contracts administered by DOWC." *Id.* ¶ 65. Mepco did not stop billing the purchasers with whom it had entered into contracts. Notwithstanding the fact that Mepco had not agreed to stop billing purchasers, DOWC notified Mepco that "18W would start charging customers on behalf of DOWC for the monthly payments for its Service Contracts." *Id.* ¶ 65.[11] And 18W billed purchasers for amounts due under the payment plan agreements, even while the purchasers were receiving bills for the same periods from Mepco. Not surprisingly, purchasers didn't like getting two bills. As DOWC sees it "Mepco's noncompliance triggered additional customer complaints and dissatisfaction, which led to further cancellations of the underlying Service Contracts, and further damage to DOWC and 18W." *Id.* ¶ 67. To prevent further confusion, and to protect its remaining service contracts, "18W halted its efforts to transfer payment plans from Mepco." *Id.* ¶ 68. But DOWC's efforts to terminate Mepco's payment plan agreements, and its continuing assertions that it has the right to do so, launched this litigation.

---

[11] DOWC alleges that it is "expressly permitted under the Payment Plan Agreement" for 18W to charge customers under the Payment Plan Agreements. Counterclaims ¶ 65. The allegation bases the statement on page 2 of the Payment Plan Agreement. The allegation appears to be inconsistent with the text of the Payment Plan Agreement, however, which contains no text authorizing 18W—the seller—to charge purchasers who are parties to the Payment Plan Agreement. The Payment Plan Agreement does contain several payment options, under which the purchaser authorizes either Mepco or DOWC, as administrator, to charge the purchaser's credit card or bank account for payments due. Payment Plan Agreement at 2. Those provisions do not appear to authorize 18W to charge purchasers because 18W is not the administrator. DOWC's allegation regarding the authority provided to 18W under the Payment Plan Agreement appears to be inconsistent with the text of the agreement.

### 8.  Why DOWC Thought It Could Terminate the Payment Plan Agreements

DOWC recognizes that the Administrator Agreement—the only agreement between it and Mepco—does not expressly provide it the right to terminate the Payment Plan Agreements entered into between Mepco and purchasers.  Nonetheless, DOWC presents a number of reasons why it believes that it should be entitled to terminate those contracts.  One of DOWC's contentions— namely, that Mepco is DOWC's agent, and is, therefore, required to follow its instructions—is based in part on the negotiating history of the parties, which is recounted below.

### i.    The Unexecuted Form Payment Plan Agreement

DOWC argues that Mepco acts as DOWC's agent in connection with each of the payment plan agreements.  DOWC's argument does not rest on the text of the Payment Plan Agreement entered into between Mepco and purchasers.  Instead, DOWC points to language contained in an unexecuted form payment plan agreement that it reviewed when it first began to explore a relationship with Mepco.

In 2017, when DOWC and Mepco were "originally exploring a business partnership," DOWC received from Mepco a "Form Payment Plan Agreement."  *Id.* ¶ 26.  "In or around 2017, Mepco provided to DOWC training materials, instructions, forms, and a form Administrator Agreement, which is largely similar to the Administrator Agreement the parties ultimately signed in or around January 2019.  Included in that package of documents was a file named 'Form Payment Plan Agreement.'"  *Id.* ¶ 27.  DOWC alleges that when it entered into the Administrator Agreement in 2019, it "reasonably relied on the Form Payment Plan Agreement it had received from Mepco" in 2017.  *Id.* ¶ 26.[12]

---

[12] The Counterclaims do not plead more facts detailing the basis for DOWC's alleged "reasonable reliance" on a form document provided to it in 2017 for a transaction that closed in 2019.  The transaction documents do not attach a mandated form of payment plan agreement.  To the contrary, as detailed above, the contracts provide Mepco the right to generate form payment plan agreements, and do not provide the other parties any express rights to control the content of the documents created by Mepco.  The Counterclaims also do not provide factual support for DOWC's

The form payment plan agreement provided to DOWC in 2017, Dkt. No. 29-1, Ex. C (the "Form Payment Plan Agreement"), differed substantially from the Payment Plan Agreements actually entered into by Mepco and purchasers. Most significantly, from DOWC's perspective, is the fact that the Form Payment Plan Agreement contained language stating that the agreement was to be entered into "between Purchaser (shown above) and Seller <u>on behalf of and as agent for the administrator listed below</u>." *Id.* (emphasis added); Counterclaims ¶ 28. DOWC emphasizes the underscored language in its Counterclaims and arguments regarding its purported authority to terminate the Payment Plan Agreements. DOWC emphasizes this language because DOWC reads it to provide that Mepco was expected to act as agent for DOWC as administrator under the payment plan agreements.

A brief detour is warranted to point out that DOWC's argument relies on an apparently flawed belief that Mepco was the "Seller" under the Form Payment Plan Agreement. After all, only if Mepco was the "Seller" would the language stating that "Seller" was to act "as agent for the administrator" provide any support for DOWC's position that Mepco should be treated as DOWC's agent as a result of the text. A close review of the Form Payment Plan Agreement shows that the "Seller" to which it refers is not the same entity as Mepco. There are many textual cues in the Form Payment Plan that lead to this conclusion. First, "Seller" is a defined term, referring to a blank entity name to be completed—including a blank line for the Seller's "Salesperson." Mepco is not alleged to sell service contracts. Second, the term "MEPCO" is defined separately from "Seller." *Id.* ("The Balance of Sales Price shall be paid by Purchaser to Administrator in care of Administrator's service provider, Mepco Finance Corporation ('MEPCO').")." "Seller" also makes representations to

---

"reasonable reliance" on the Form Payment Plan Agreement in light of the fact that the form agreement clearly contemplates a different transaction structure than the one ultimately arrived at between the parties—one in which sellers entered into payment plan agreements with purchasers, rather than having a separate direct agreement between Mepco and the purchaser, as was the case in the transaction structure ultimately adopted by the parties.

"MEPCO" in the Form Payment Plan Agreement.  *Id.* ("Seller and Purchaser represent to

Administrator and MEPCO that Purchaser's decision to purchase the Contract from Seller under

the payment program did not result in Seller charging Purchaser . . . .").  Typically, entities do not

make representations to themselves.  These provisions of the Form Payment Plan Agreement

substantially undermine DOWC's contention that the language in that unexecuted agreement

committing "Seller" to act as DOWC's agent must mean that Mepco agreed to do so.

DOWC does not allege that it took any steps to determine what language would be included

in the payment plan agreements used by Mepco before closing its deal with Mepco.  DOWC's

Counterclaims suggest that it was Mepco's fault that DOWC failed to ascertain and lock down the

form of agreement to be used by Mepco, rather than a blunder by DOWC or its counsel.

> Mepco did not provide for DOWC's review or approval [of] an alternative or revised
> version of the Form Payment Plan during the negotiations of the Administrator
> Agreement signed in January 2019.  As a result, DOWC entered into the
> Administrator Agreement based on the understanding that Mepco would continue
> using the same or substantially similar Form Payment Plan Agreement and Mepco
> would operate as DOWC's agent with respect to Payment Plan Agreements, as
> described in the Form Payment Agreement . . . .

Counterclaims ¶ 29.

DOWC entered into its arrangement with Mepco ignorant of the terms and structure of the

payment plan agreements that Mepco would use.  "Unbeknownst to DOWC, Mepco changed the

underlying structure of its Payment Plan Agreement and apparently replaced the Form Payment Plan

Agreement in the Inline CRM with a vastly different instrument."  *Id.* ¶ 31.

> The most significant change was to the parties of [sic] the Payment Plan Agreement.
> Contrary to its commitment in the Administrator Agreement, Mepco replaced "Seller
> (as agent for Administrator)" with "Mepco."  Mepco made other obvious changes.
> For example, in the Promise to Pay provision[,] it replaced the obligation to pay
> Administrator with the requirement to pay the balance of the sales price "to Mepco,
> on behalf of Mepco."

*Id.* ¶ 32.  From DOWC's perspective "Mepco's unilateral modifications to the Payment Plan Agreement could not and did not, however, alter the fundamental relationship between the parties." *Id.* ¶ 33.

DOWC alleges in conclusory fashion that "Mepco's representations with respect to the Form Payment Plan Agreement became part and parcel of the binding agreement between Mepco and DOWC."  *Id.* ¶ 30.  DOWC does not identify what the alleged representations were, however. DOWC merely describes the fact that it was provided with this form agreement in 2017, well over a year before the parties entered into their 2019 transaction.  DOWC does not allege any representations made by Mepco regarding the form agreement.  Presumably because the Form Payment Plan Agreement was not executed, DOWC does not allege that Mepco made representations in it to DOWC.

So, DOWC's view that it was entitled to terminate the payment plan agreements entered into by Mepco with purchasers rests in large part on the text of an unexecuted agreement provided to it well over a year before it ultimately entered into the transaction with Mepco.  DOWC claims that the language describing the fact that the "Seller" under that for agreement would act as agent for the administrator means that Mepco must be acting as its agent under the agreements actually put into effect.  It takes this position notwithstanding the facts pleaded in the Counterclaims and its attached documentation that (1) the form agreement was never entered into, (2) the form agreement does not define the "Seller" to mean Mepco, and (3) the transaction documents actually entered into by the parties expressly provide Mepco the discretion to generate and provide form payment plan agreements.

> ii.   **DOWC's Assertion of its "Absolute Right" to Terminate Payment Plan Agreements**

DOWC's other explanations for its belief that it could unilaterally terminate Mepco's payment plan agreements are legal arguments, rather than facts.  Still, many are presented in the

Counterclaims as if they were facts.  As a result, for context, the Court will outline some of DOWC's contentions in the Counterclaims regarding its understanding of the agreements.

DOWC acknowledges that the Administrator Agreement "is silent regarding DOWC's right to cancel Mepco's services in connection with existing Service Contracts."  Counterclaims ¶ 56. However, in DOWC's view, at the same time "nothing in the language of the Administrator Agreement limits DOWC's right to unwind the business relationships DOWC created for its benefit under the Payment Plan Program."  *Id.*  DOWC does not identify the legal source of the "right" that it alleges itself to have.  It asserts that the right is implicit in the fact that DOWC engaged Mepco to provide payment plan services, "as explicitly set out by the Administrator Agreement."  *Id.* ¶ 57.[13]

Because it engaged Mepco to do the work, DOWC asserts that it "had the absolute right to terminate Mepco's services, especially when DOWC believed that Mepco's services were detrimental to DOWC's relationships with customers and strategic business partners."  *Id.* ¶ 55.  "It would be nonsensical to interpret the silence of the Administrator Agreement as to Administrator's cancellation rights to mean that the only party in this relationship that <u>does not</u> have a right to terminate a Payment Plan Agreement is the Administrator, which is a party to the Payment Plan Agreement and for whose benefit and convenience the Payment Plan Agreement was generated in the first place."  *Id.* ¶ 63.[14]

---

[13] The Court understands this to be a reference to text included in the "Background" section of the Administrator Agreement.  Administrator Agreement at 1.

[14] The factual assertion in the Counterclaims that the Administrator is a party to the Payment Plan Agreement is contradicted by the text of the document, and is, therefore, not entitled to the assumption of truth.  *See In re Elan Corp. Sec. Litig.*, 543 F.Supp.2d 187, 206 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." (citation omitted)); *Rapoport v. Asia Elecs. Holding Co.*, 88 F.Supp.2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint." (citation omitted)).

### b. Procedural History

Plaintiff Mepco filed this case on July 21, 2020, shortly after DOWC attempted to terminate its payment plan agreements.  Dkt No. 1.  Mepco filed an Amended Complaint on July 23, 2020.  AC, Dkt. No. 8.  The Amended Complaint requests that the Court grant declaratory judgment regarding the rights and obligations of DOWC and Mepco under the Administrator Agreement.  In particular, Mepco seeks a declaration regarding DOWC's asserted right to cancel its payment plan agreements, as well as DOWC's obligations to pay it a refund if a service contract is cancelled.  *Id.* ¶¶ 39–41.  The Amended Complaint also asserts a claim for tortious interference with contracts.  *Id.* ¶¶ 42–46.

Defendant filed an Answer and Counterclaim on November 4, 2020.  Dkt. No. 29.  Plaintiff filed a motion to dismiss Defendant's counterclaims on January 8, 2021.  Dkt. No. 43.  In response, Defendant filed an amended Answer and Counterclaim on January 30, 2021.  Dkt. No. 48.  DOWC's Counterclaims assert claims against Mepco for declaratory judgment regarding the parties' rights under the Administrator Agreement.  In particular, DOWC asks that the Court "confirm that it has standing and the right to terminate Mepco's payment plan services with respect to Service Contracts sold by 18W and administered by DOWC."  Counterclaims ¶ 82.  It also seeks confirmation that "DOWC effectively terminated the underlying Payment Plan Agreements relating to Service Contracts sold by 18W and administered by DOWC upon notice to Mepco in July 2020." *Id.* ¶ 83.  Assuming that it has the right to terminate payment plan agreements, DOWC asks the Court to confirm how the refund it would owe upon cancellation would be calculated.  *Id.* ¶ 84.

The Counterclaims also assert a claim for breach of the implied covenant of good faith and fair dealing.  *Id.* ¶¶ 85–95.  DOWC asserts that implied in the Administrator Agreement is a duty "to provide adequate information about the monthly payments and the applicable Service Contract."  *Id.* ¶ 89.  DOWC believes that this obligation "is implied in the memorialized understanding that any

Service Contract is 'subject to Purchaser's right to cancel the Service Contract and receive a refund from Administrator of any unearned payment.'" *Id.* Because DOWC can only profit from its Service Contract "when customers maintain and continue to pay for their Service Contracts over the extended period of time," DOWC argues that "Mepco had an implied duty to interact with DOWC customers and service the payment plan program in a manner that did not injure the right of DOWC and the applicable Seller to earn its fees on a Service Agreement over time." *Id.* ¶¶ 91–92.

Finally, DOWC asserts counterclaims for tortious interference with contract and prospective economic advantage. DOWC claims that Mepco "intentionally and with malice interfered with DOWC's rights under the Service Contracts and deprived it of the future benefit of the Service Contracts by refusing to respond to inquiries and disputes regarding the monthly payments for the Service Contracts, despite DOWC's request." *Id.* ¶ 99. DOWC claims that Mepco's failure to "train its staff to respond to customer inquiries in a timely manner" also gives rise to a claim for tortious interference with DOWC's prospective economic advantage. *Id.* ¶ 100. DOWC also claims that Mepco "intentionally and with malice interfered with Service Contracts when it refused to comply with DOWC's demand to stop billing customers whose payment plan accounts DOWC had cancelled, which led to customer confusion and/or double billing." *Id.* ¶ 103.

Plaintiff filed a motion to dismiss the amended counterclaims, accompanied by a memorandum of law on March 2, 2021 ("Memo Mot. to Dismiss"). Dkt. Nos. 52–53. In its motion, Mepco argues that DOWC's claim for declaratory judgment should be dismissed because DOWC does not have the contractual right to terminate the Payment Plan Agreements, to which it was not a party. Mepco argues that the implied covenant of good faith and fair dealing does not impose specific obligations regarding the manner in which they must service accounts. Finally, Mepco also argues that DOWC fails to plausibly allege tortious interference with contract. DOWC opposed Plaintiff's motion to dismiss. *See* Memorandum of Law in Opposition to Plaintiff's Motion

to Dismiss Defendant's Counterclaim ("Opp'n"), Dkt. No. 57.  Plaintiff then filed a reply in further

support of its motion to dismiss.  Plaintiff's Reply ("Reply"), Dkt. No. 58.

## III.    LEGAL STANDARD

### a.  Rule 12(b)(6)

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to

dismiss a complaint."  *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 397 (S.D.N.Y.

2018) (Nathan, J.) (quoting *Orientview Techs. LLC v. Seven for All Mankind, LLC*, No. 13-cv-0538, 2013

WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

(citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent

with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible."

*Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which

his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative

level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550

U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S.

at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable

inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008)

(per curiam).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere
> conclusory statements, do not suffice."  A complaint must therefore contain more

> than "naked assertion[s] devoid of further factual enhancement." Pleadings that
> contain "no more than conclusions . . . are not entitled to the assumption of truth"
> otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting

*Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked

assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556

U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the

complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v.

Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). In that context, "[a] court's task is to assess the legal

feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on

either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule

12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a

claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses

the legal feasibility of the complaint, but does not weigh the evidence that might be offered to

support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a

district court may consider the facts alleged in the complaint, documents attached to the complaint

as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable

L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is

well established that a pleading is deemed to include any 'written instrument' that is attached to it as

'an exhibit,' or is incorporated in it by reference." *Lynch*, 952 F.3d at 79 (citations omitted). Courts

may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554,

559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir.

2016)).

A court can also consider documents that are "integral to" the complaint. *Id.* In order for a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effects, thereby rendering the document integral to the complaint.") (internal quotation marks omitted)).

While, as a general matter, the Court must accept the facts alleged in the complaint as true, "when any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002), *aff'd sub nom. Rozsa v. SG Cowen Sec. Corp.*, 165 F. App'x 892 (2d Cir. 2006).

### b. Contract Interpretation Under New York Law

The Administrator Agreement is governed by New York law. Under New York law, to state a claim for breach of contract "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)). "When interpreting a contract, our 'primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113–114 (2d Cir. 2014) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 704 F.3d at 99 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).  Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Comm'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).  "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation:  words and phrases should be given their plain meaning and a contract should be construed as to give full

meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."). But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Rather, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted).

On a motion to dismiss, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill*, 830 F.3d at 156; *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."). In other words, courts are not "obliged to accept the allegations of the complaint as to how to construe a contract," but they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

### c. Declaratory Judgment

Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act does not require a court to issue a declaratory judgment.

The Act "confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952). In order to decide whether to entertain an action for declaratory judgment, a district court is instructed to ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).

## IV.   ANALYSIS

### a.   DOWC is Not Entitled to Terminate the Payment Plan Agreements

Plaintiff's motion to dismiss DOWC's counterclaim for declaratory judgment is granted. The Counterclaims do not plausibly plead that DOWC is entitled to cancel the Payment Plan Agreements because DOWC is not a party to the payment plan agreements, and because DOWC failed to negotiate a contractual right to force the parties to the payment plan agreements to terminate the agreements at its request. Nor is DOWC entitled to "terminate Mepco's services and replace Mepco as its payment plan processor without terminating the underlying Payment Plan Agreement." Opp'n at 18 (underscoring omitted).

Because DOWC is not a party to the Payment Plan Agreements, DOWC cannot modify them.[15] "A contract cannot be modified or altered without the consent of all parties thereto. In

---

[15] As noted above, DOWC asserts that it is a party to the Payment Plan Agreement in the Counterclaims, but that fact is contradicted by the language of the contract itself. And DOWC seems to concede "that DOWC is not listed as a party in a recent version of the Payment Plan Agreement." Opp'n at 9. However, DOWC argues that findings of fact are necessary to "determine when Mepco improperly replaced the Form Payment Plan Agreement with the Modified Payment Plan Agreement, what other versions of Payment Plan agreements were used, and whether DOWC was identified as a party in such agreements." Opp'n at 9 n. 1. These are pertinent arguments. However, the request for declaratory judgment in the Counterclaims asks the Court to evaluate the rights of DOWC under the Payment Plan Agreements, defined to mean those agreements in the form provided to the Court by DOWC together with the Counterclaims. The Counterclaims do not seek a declaration regarding DOWC's rights regarding other forms of agreements that may or may not exist, and the Court does not take a position regarding any such rights in ruling on this motion: the Court is dismissing DOWC's counterclaim for declaratory judgment regarding its rights under the Payment Plan Agreement. The ruling here regarding the scope of DOWC's rights does not apply to any agreements that do not conform to the Payment Plan Agreement presented to the Court.

other words, a contract cannot be modified without the mutual assent of each party." 22A N.Y. Jur. 2d Contracts § 475.  As alleged, the actual parties to the Payment Plan Agreements have not agreed to terminate them, or to substitute another party for Mepco.

DOWC suggests that because each purchaser under the Payment Plan Agreements authorizes DOWC to charge purchasers, that DOWC must also have the implied right to cancel the agreements.  Opp'n at 26 ("Even though DOWC is not listed as a party in the Modified Payment Plan Agreement, DOWC is authorized to charge purchasers for their Service Contracts. . . .  Thus, . . . the Court would need to consider extrinsic evidence to resolve the ambiguity and answer the central question whether DOWC has a right to cancel Mepco's services and charge customers as set forth in the Payment Plan Agreement.").  But the Payment Plan Agreement provided to the Court is not ambiguous in this regard.  That DOWC is authorized to collect charges does not provide it the right to terminate the agreement.  DOWC provides no legal support for its argument that language in the Payment Plan Agreement authorizing it to collect certain payments also gives it the right to terminate the agreement at will.

DOWC argues that it has the right to cause Mepco to terminate the Payment Plan Agreements as a result of language included in the Administrator Agreement.  The Administrator Agreement does not give DOWC the right to force Mepco to terminate Payment Plan Agreements.[16]

---

[16] Further, the Court observes one of the many profound flaws in DOWC's reasoning—namely the presumption that Mepco has the right under the payment plan agreements to terminate them at will when directed to do so by DOWC.  It does not.  As described above, the Payment Plan Agreement permit purchasers to cancel the contract "at any time." Payment Plan Agreement at 2.  But under the Payment Plan Agreement, Mepco can only terminate the contract in the event that "(a) Purchaser elects not to make the next payment due pursuant to this Agreement, (b) MEPCO receives a Termination Notice [from the purchaser], or (c) an Event of Default occurs."  Id. at 3.  So, even if DOWC had the right to cause Mepco to terminate the Payment Plan Agreements—and it doesn't—the Payment Plan Agreement does not provide Mepco the authority to cancel the contract solely as a result of that external direction.  And DOWC does not have the right to force the purchasers to change their agreements with Mepco.  The Service Agreements contain an integration clause which states the following:  "This Service Contract represents the entire agreement between You and Us. . . .  No other written or oral statements apply to this Service Contract."  Service Contract ¶ 11.  The Service Contract does not give DOWC rights with respect to any payment plan agreement entered into by the relevant purchaser.  So, even if DOWC had the right to cause Mepco to amend the payment plan agreements—and, again, it doesn't—DOWC did not obtain the authority to force the other party to the payment plan agreement—the purchaser—to agree to the modification.  DOWC's myopic focus on whether it has the authority to cause Mepco to change or

The agreement is not ambiguous in that respect.  There is no provision in the Administrator Agreement that provides DOWC that right.  The parties negotiated covenants between Mepco and DOWC, but none provide DOWC the right to modify payment plan agreements.  The agreement contains a section addressing circumstances in which payment plan agreements can be cancelled.  Administrator Agreement ¶ 3(a)–(b).  ("Cancellation by SING . . . Cancellation by Purchaser").  The parties expressly contemplated circumstances in which they might cancel payment plan agreements and did not provide for cancellation rights by DOWC.

DOWC argues that "[i]t would be nonsensical to interpret the silence of the Administrator Agreement as to Administrator's cancellation rights to mean that the only party in this relationship that does not have a right to terminate a Payment Plan Agreement is the Administrator."  Counterclaims ¶ 63.  But that is exactly the consequence of DOWC's failure to negotiate express cancellation rights.  The result may not be what DOWC wanted.  It may have been nonsensical for DOWC to have failed to negotiate such a provision in its agreement.  But DOWC did not negotiate for express cancellation rights, when others did.  The Court looks to the text of the agreement to determine the parties' intent, and it is unambiguous on this point—the parties to the Administrator Agreement did not provide DOWC the right to cancel the Payment Plan Agreements.

DOWC proffers several arguments seeking to imbue in the agreement a contractual right that it failed to negotiate, but none hold water.  First, the language in the "Background" section of the Administrator Agreement does not give DOWC the right to terminate the Payment Plan Agreements.  DOWC points to the language in the preamble to the Administrator Agreement which states that Mepco "is in the business of servicing payment plan programs for sellers and administrators of Service Contracts" and that the "parties are entering into this Agreement to agree

---

terminate the payment plan agreements ignores the fact that Mepco is not the only party to those agreements and that the purchasers too must consent to amend the agreements.

on the terms and conditions upon which SING will support and service Administrator's Payment

Plan Program."  Administrator Agreement at 1.  DOWC argues that this "broad language" in the

recitals to the agreement "suggests that DOWC retained Mepco to provide payment services to

DOWC's customers on behalf of DOWC, which implies the right to control the quality of such

services and take action when the level of service is unsatisfactory."  Opp'n at 19.

DOWC reads far too much into the recitals of the agreement.  Under New York law, recitals

"cannot be used to modify or create substantive rights not found in the contract's operative

clauses."  *RSL Commc'ns, PLC v. Bildirici*, No. 4-cv-5217, 2010 WL 846551, at *4 (S.D.N.Y. Mar. 5,

2010) (citing, *inter alia, Ross v. Ross*, 253 N.Y.S. 871, 882 (1st Dep't 1931) ("The recitals in a contract

form no part thereof, and at most indicate but the purposes and motives of the parties.")).  As

described above, the statements in the "Background" section of the Administrator Agreement are

recitals, contained in a separate section from the section headed "Agreement," which contains the

parties representations, covenants, and obligations.  And the very language on which DOWC's

argument relies makes it clear that the rights DOWC argues the recitals imply do not exist.  The

language states that the "parties are entering into this Agreement to agree on <u>the</u> terms and

conditions upon which SING will support and service Administrator's Payment Plan Program."

Administrator Agreement at 1 (emphasis added).  The use of the definite article "the" in that

sentence makes it clear that the terms and conditions upon which SING will support and service the

program are those set forth in the agreement, not unexpressed terms implied by general language in

the recitals.

The definition of the term "Payment Plan Agreement" in the Administrator Agreement does

not give DOWC the right to terminate Payment Plan Agreements.  The Administrator Agreement

defines the term "Payment Plan Agreement" as follows:  "'Payment Plan Agreement' for a particular

Account means the agreement between the Administrator or Seller and Purchaser to pay the Sales

Price of a Service Contract (less the Down Payment) in installment payments . . . ."  Administrator

Agreement App'x A.[17]  DOWC argues that, because the term is defined to mean an agreement

between the administrator and purchaser, as opposed to between Mepco and purchaser, DOWC

must have the implied right to terminate or modify the Payment Plan Agreements entered into by

Mepco.  Opp'n at 19.  Because the argument is wanting in logical coherence, it is difficult to address,

but the Court discusses what it understands to be the basis of DOWC's contentions below.

First, to the extent that DOWC is arguing that the definition contained in the Administrator

Agreement somehow modifies the parties to the actual Payment Plan Agreements, the argument has

no merit.  The parties to the Payment Plan Agreements are clearly Mepco and the relevant

purchaser.  DOWC cannot point to parol evidence—a provision in the separate Administrator

Agreement—to change the meaning of the Payment Plan Agreements themselves.  *See, e.g.*, *Sec. Plans,*

*Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 815-16 (2d Cir. 2014) (explaining that parol evidence

cannot create an ambiguity in a contract); *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447,

466 (S.D.N.Y. 2018) (same).

Second, to the extent that DOWC argues that the definition of "Payment Plan Agreement"

in the Administrator Agreement suggests that Mepco was required to use a particular form of

payment plan agreement, that argument is not supported by the text of the Administrator

Agreement itself, or the related transaction documents.  The Administrator Agreement does not

require that Mepco use a specified form of payment plan agreement.  Section 2(b) of the agreement

requires that DOWC provide to Mepco upon submission of an account "the fully-completed

Payment Plan Agreement, duly executed by Purchaser, <u>or</u> such other documentation as specified

from SING."  Administrator Agreement ¶ 2(b) (emphasis added).  This section of the agreement

---

[17] This definition of the term Payment Plan Agreement is consistent with the Form Payment Plan Agreement, which indicated that it was to be entered into between the seller of the relevant service contract and the purchaser.

expressly preserved Mepco's option to present documents specified by it, rather than any particular form of agreement.  Appendix B of the Administrator Agreement expressly provides Mepco sole discretion over approval of the forms presented to purchasers.  Administrator Agreement App'x B ("The Seller must inform the Purchaser of the terms of the Payment Plan Program only by means of forms and written communications supplied by, or reviewed and approved in advance by, SING, in its sole discretion.").  Rather than requiring that Mepco use a particular form of payment plan agreement, or requiring that DOWC approve such forms, the Administrator Agreement contains a provision permitting Mepco to generate forms regarding the program's terms "in its sole discretion."

DOWC failed to require that Mepco only use a particular form of payment plan agreement, and, instead, authorized Mepco to provide forms to sellers, and thence, purchasers, in its sole discretion.  The definition of "Payment Plan Agreement" in the Administrator Agreement does not imply a right on the part of DOWC to terminate agreements entered into by Mepco that do not conform to the definition of the term.[18]  The Court notes that Dealer Agreement also gives Mepco the flexibility to use payment plan agreement forms of its choosing.  Dealer Agreement ¶ 2(a) ("Dealer shall offer Service Contracts with an installment payment plan . . . to Purchasers only on forms . . . which have been provided by SING . . . .").

DOWC's argument that it has the right to terminate Payment Plan Agreements is also inconsistent with its express disclaimer of an interest in the agreements.  In the Administrator Agreement, DOWC explicitly "acknowle[d] and agree[d] that title to all Accounts (including all Payment Plan Agreements related thereto and all amounts owing by a Purchaser pursuant to any Payment Plan Agreement ) shall at all times be vested in [Mepco] and its assignees, and neither

---

[18] To decide this motion, the Court need not address the question of whether and how the Administrator Agreement works with respect to payment plan agreements entered into by Mepco that do not conform to the definition of the term.  The question presented here is whether the Administrator Agreement provides DOWC the right to terminate such agreements.

Administrator, Insurer, nor the Seller shall have any right, title or interest therein."  Administrator Agreement ¶ 8(l).  The Court observes that the Dealer Agreement contains a similar provision in which 18W too represented that it had no interest in payment plan agreements.  Dealer Agreement ¶ 13(m) ("Dealer acknowledges and agrees that title to all Payment Plan Agreements and all amounts owing by a Purchaser pursuant to any Payment Plan Agreement shall at all times be vested in SING and its assignees, and Dealer shall have no right, title, or interest in any Payment Plan Agreement or any such amounts.").  DOWC and 18W both expressly disclaimed any "interest" in the "Payment Plan Agreements."  DOWC's arguments that it has an interest in them—namely, a right to terminate or modify them—are inconsistent with these express contractual representations.

Finally, DOWC does not adequately allege that Mepco was DOWC's agent with respect to the payment plan program.  Under New York common law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act."  *N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.*, 266 F.3d 112, 122 (2d Cir. 2001) (internal quotations and citations omitted).  "Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking."  *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)).  "On a motion to dismiss, the relevant inquiry is 'whether plaintiff has made specific allegations from which an agency relationship can be inferred.'"  *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011) (quoting *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 111 (S.D.N.Y. 2009)).

DOWC does not adequately plead that Mepco was its agent.  DOWC's contention rests on the allegation that Mepco provided it the Form Payment Plan Agreement in 2017.  The Form Payment Plan Agreement contained language stating that the agreement was to be entered into

"between Purchaser (shown above) and Seller *on behalf of and as agent for the administrator listed below*." Form Payment Plan Agreement at 1; Counterclaims ¶ 28 (emphasis added).  Those allegations do not plausibly plead that Mepco agreed to act as DOWC's agent for a number of reasons.  First, as alleged, Mepco did not enter into the Form Payment Plan Agreement; it was merely a draft provided to DOWC over a year before the parties finalized their agreement.  As a result, there is no plausible basis in the unexecuted draft agreement to conclude that Mepco agreed in it to act as DOWC's agent.  Second, as described above, the Form Payment Plan Agreement provides that "Seller," not Mepco, is to act as agent for the administrator.  The Form Payment Plan Agreement defines Seller as an entity separate from Mepco.  Therefore, there is no basis in the text of the Form Payment Plan Agreement to conclude that Mepco agreed to act as DOWC's agent.

The recitals in the Administrator Agreement also do not provide a plausible basis upon which to conclude that Mepco agreed to act as DOWC's agent.  As described above, the "Background" section of the Administrator describes the general purpose of the agreement to introduce the specific terms agreed to between the parties.  The language does not refer to Mepco as DOWC's agent or otherwise suggest an agency relationship, rather than a commercial relationship on the terms detailed in the agreement.  As a result, DOWC does not plausibly plead that Mepco agreed to act as DOWC's agent in connection with the payment plan program, or the Payment Plan Agreements.

In sum, the Administrator Agreement does not provide DOWC the right to force Mepco to terminate the Payment Plan Agreements.  Instead, in the Administrator Agreement DOWC specifically disclaims any interest in the Payment Plan Agreements.  DOWC failed to negotiate the contractual right to terminate or modify the Payment Plan Agreements.  DOWC cannot now fill the gap with allegations regarding its intentions at the time that the contract was negotiated.  Because DOWC has not plausibly pleaded that it is entitled to terminate or amend the Payment Plan

Agreements unilaterally, Mepco's motion to dismiss DOWC's application for declaratory judgment regarding its rights to terminate or amend the Payment Plan Agreements is granted.  Because DOWC has not established a right to cancel the Payment Plan Agreements, the Court does not need to determine the amount that it would owe Mepco were it to do so.

### b.  Implied Covenant of Good Faith and Fair Dealing

Because the implied covenant of good faith and fair dealing does not graft new substantive obligations into a contract, and there are no provisions in the Administrator Agreement suggesting that Mepco was required to provide a minimum level of service to purchasers, DOWC's counterclaim for breach of implied covenant of good faith and fair dealing is dismissed.

Choice-of-law provisions that govern a contract also govern related claims for breach of the implied covenant of good faith and fair dealing.  *See Comprehensive Habilitation Servs., Inc. v. Com. Funding Corp.*, No. 5-cv-9640, 2009 WL 935665, at *10 n.14 (S.D.N.Y. Apr. 7, 2009) (explaining that "[b]ecause breach of the implied covenant of good faith and fair dealing is a contractual cause of action, and the choice of law provision applies to the interpretation and enforcement of the contract," the law of the forum specified in a contract's choice-of-law provision applied to the implied covenant claim).  The Administrator Agreement is governed by New York law. Accordingly, the Court applies New York law to evaluate DOWC's claim for breach of the implied covenant of good faith and fair dealing.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State Street Bank & Trust Co. v. Inversiones Errazuriz Ltda.*, 374 F.3d 158, 169 (2d Cir. 2004) (*quoting 1-10 Industry Associates, LLC v. Trim Corp. of America*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)).  The implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) (quoting *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y.1993)).  "It does not 'add to the contract a

substantive provision not included by the parties.'"  *Id.*  Nor may the Court interpret the implied

covenant to "extend so far as to undermine a party's 'general right to act on its own interests in a

way that may incidentally lessen' the other party's anticipated fruits from the contract."  *M/A-COM*

*Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc.*

*v. Hayden Pub. Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)).  "In general, courts enforce the implied

covenant where an implied promise was 'so interwoven in the whole writing' of a contract as to be

necessary for effectuation of the purposes of the contract."  *Id.*

　　　"A breach of the duty of good faith and fair dealing is considered a breach of contract."

*Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011); *see also Harris v. Provident Life and Accident Ins. Co.*,

310 F.3d 73, 80 (2d Cir. 2002) ("Under New York law, parties to an express contract are bound by

an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."

(internal quotation and citation omitted)).  "'The elements of a claim for breach of the duty of good

faith and fair dealing are practically identical to the elements of a negligence claim':  (1) defendant

must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach

that duty by acting in bad faith or failing to conduct fair dealing; and (3) the breach of duty must

proximately cause plaintiff's damages."  *Washington v. Kellwood Co.*, No. 5-cv-10034, 2009 WL 855652,

at *6 (S.D.N.Y. Mar. 24, 2009) (quoting *Boyd v. University of Illinois*, No. 96-cv-9327, 2001 WL 246402,

at *10 (S.D.N.Y. Mar. 13, 2001)).

　　　DOWC's does not plausibly plead the elements of its claim.  DOWC claims that the

Administrator Agreement implies a duty on the part of Mepco to "answer calls, respond to inquiries

regarding monthly payments, explain the nature of the charges when asked and provide accurate

information to customers."  Opp'n at 30.  DOWC argues that alleged duty is implied in three

sources:  (1) the Form Payment Plan Agreement, Opp'n at 29 ("Mepco's role is described in the

Form Payment Plan Agreement as that of the "Payment Plan Servicer.");  (2) the Payment Plan

Agreement, *id.* ("the Modified Payment Plan Agreement states that Mepco is responsible for providing 'billing and payment processing' and lists Mepco's toll free telephone number . . . next to Mepco's name on the top of the first page . . . ."); and (3) the "Background" section of the Administrator Agreement, *id.* The Court responds briefly to each argument in turn below.

First, it is clear that there is no implied covenant of fair dealing in the Form Payment Plan Agreement. As alleged, the Form Payment Plan Agreement never entered into force. The Court does not see a basis to extrapolate implied obligations of good faith and fair dealing from a draft agreement that was never signed. Second, the Payment Plan Agreement itself contains no covenants related to the quality of service to be provided by Mepco to the purchaser from which the duties that DOWC outlines might be implied.[19]

Third, the Administrator Agreement does not contain covenants by Mepco to DOWC obligating Mepco to provide any level of service to purchasers. The Administrator Agreement contains a number of specific covenants. One set of covenants is titled "Service of Accounts"—just the place the parties might have included covenants requiring Mepco to provide minimal levels of service to purchasers under the payment plan agreements. Administrator Agreement ¶ 2. They did not do so. That section of the agreement does not establish any requirements regarding the minimal level of service required by Mepco with respect to payment plan agreements. Mepco's only obligations under that section of the agreement are described in detail above. None of the provisions of the agreement require that Mepco do anything in particular with respect to its management of the payment plan agreements.

---

[19] DOWC is also not a party to the Payment Plan Agreements. Therefore it does not have standing to bring claims for breach of any implied covenant of good faith, unless it is a third party beneficiary of the agreements. *See Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 527 (2d Cir. 2005). The parties do not brief this question and the Court need not reach it to resolve this motion.

Lacking foundation for its claims in the "Agreement" section of the Administrator Agreement, DOWC again strains to find a basis for its implied covenant claim in the "Background" section of the agreement.  But the recitals to the agreement do not provide a basis for the duties that it argues to be implicit in the agreement.  The implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract."  *Broder*, 418 F.3d at 198–99 (2d Cir. 2005) (quoting *Geren*, 832 F. Supp. at 732).  "It does not 'add to the contract a substantive provision not included by the parties.'"  *Id.*  The parties did not agree to establish requirements for Mepco's servicing of payment plan agreements—such obligations are not "interwoven" into the text of the agreement.  DOWC seeks to graft into the contract substantive obligations that it failed to negotiate.  The implied covenant of good faith and fair dealing does not stretch so far.

Moreover, DOWC's argument that Mepco had an implied duty to "support Service Contracts administered by DOWC in good faith," Counterclaims ¶ 95, is inconsistent with express language contained in the Administrator Agreement.  The Agreement states that, to the contrary, "[Mepco] shall have no responsibility, liability, or obligations with respect to the administration, service, or maintenance of any Service Contract or any of Administrator's obligations under this Agreement."  Administrator Agreement ¶ 2(g).  Because DOWC has failed to plausibly allege that Mepco had implied duties of the type alleged in the Counterclaims, its claim for breach of the implied covenant of good faith and fair dealing must fail.

Finally, DOWC has not plausibly alleged that Mepco acted in bad faith.  DOWC alleges in a conclusory manner that Mepco acted "intentionally and with malice."  Counterclaims ¶¶ 99, 103.  But DOWC does not provide non-conclusory allegations that support this element of the claim.  Instead, DOWC makes allegations to the effect that "Mepco failed to respond to customer inquiries in a timely manner [and] refused to provide supporting information when a customer questioned or disputed credit card charges for the Service Contract."  *Id.* ¶ 93.  Similarly, DOWC alleges that

Mepco failed to train its staff.  *Id.* ¶ 100.  However, these are not plausible allegations of bad faith.

By themselves, they are allegations of negligence alone.  Indeed, DOWC describes Mepco's conduct

as a "lack of care and/or willful negligence."  *Id.* ¶ 47.  Negligent conduct alone is insufficient to

support a claim for breach of the implied covenant of good faith.  *Kortright Cap. Partners LP v.*

*Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 360 (S.D.N.Y. 2017) ("Thus, the Complaint alleges

negligence, not bad faith.  That is insufficient to state a claim for breach of the implied covenant.").

### c.  Tortious Interference with Prospective Economic Advantage

Because DOWC has not plausibly alleged that Mepco acted for a wrongful purpose or used

dishonest, unfair, or improper means, DOWC fails to state a claim for tortious interference with its

prospective economic advantage.

> To prevail on a claim for tortious interference with business relations—also known
> as tortious interference with prospective economic advantage—under New York
> law, a plaintiff must show that (1) the plaintiff had business relations with a third
> party; (2) the defendant interfered with those business relations; (3) the defendant
> acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4)
> the defendant's acts injured the relationship.

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (internal quotation and citation

omitted).  "[T]he requirements of this tort are more demanding than those imposed on a party

asserting tortious interference with the performance of an existing contract."  *Henneberry v. Sumitomo*

*Corp. of Am.*, 532 F. Supp. 2d 523, 547 (S.D.N.Y. 2007).  Also, "conduct constituting tortious

interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at

the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp. v. Noonan*, 3

N.Y.3d 182, 192 (2004).

In *16 Casa Duse*, the Second Circuit explained the requirements for the third element of a

tortious interference claim:

> [T]he "wrongful means" element sets a high bar.  Unlike a claim for tortious
> interference with contract, which requires a plaintiff to show no more than that the
> defendant intentionally and without justification procured a breach of a valid

> contract of which he was aware, a claim for tortious interference with business relations requires a plaintiff to show, "as a general rule," that "the defendant's conduct amounted to a crime or an independent tort." New York courts have recognized an exception to this rule "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." But this exception is narrow: When a defendant has acted with a permissible purpose, such as "normal economic self-interest," wrongful means have not been shown, even if the defendant was "indifferent to the plaintiff's fate." The New York Court of Appeals has not yet identified any other exceptions to the general rule.

791 F.3d at 262 (first citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996); and then quoting *Carvel Corp.*, 3 N.Y.3d at 190–91) (internal citations and alterations omitted). In sum, the third element of a tortious interference with economic advantage claim is satisfied when either 1) the defendant used improper means because her conduct "amounted to a crime or independent tort" or 2) the defendant acted with a wrongful purpose because she acted "for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (citations omitted).

DOWC fails to adequately plead this third element of its claim. The Court disregards the conclusory allegations made by DOWC in support of its claim. As noted above, DOWC alleges without factual elaboration that Mepco acted "intentionally and with malice." Counterclaims ¶ 103. Similarly, DOWC makes the conclusory allegation that Mepco made false and defamatory statements to customers about the service contracts and the Sellers that offer service contracts administered by DOWC. Counterclaims ¶ 101. DOWC does not elaborate on the substance of those statements, leaving the Court with an "unadorned, the defendant-unlawfully-harmed-me accusation," rather than a plausible allegation that Mepco used improper means. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110–11 (2d Cir. 2010) (affirming dismissal of claim of tortious interference with prospective economic advantage where allegations were vague and conclusory); *see also Samsung Display Co. v. Acacia Rsch. Corp.*, No. 14-cv-1353, 2014 WL 6791603, at *5 (S.D.N.Y. Dec. 3, 2014) (dismissing tortious interference with prospective economic advantage claim where complaint contained only "a threadbare recitation of the tort's third element . . . unaccompanied by any

allegation that [the defendant's] conduct was criminal, independently tortious, or solely motivated by a desire to inflict intentional harm on [the plaintiff]").  The alleged wrongful conduct described in the Counterclaims—failing to train its staff, not responding to inquiries and the like—is not good customer service, but it is not criminal, and it is not an independent tort.

Because the complaint does not plausibly plead that Mepco's conduct was criminal or independently tortious, it must plead that the exception applies—namely, that Mepco engaged in its conduct "for the sole purpose of inflicting intentional harm" on DOWC.  *See Carvel Corp.*, 3 N.Y.3d at 190.  The well-pleaded allegations in the Counterclaims do not support the inference that Mepco did so.  Instead, the Counterclaims expressly allege that Mepco chose not to provide a higher level of service to purchasers to promote its economic self-interest.  Counterclaims ¶ 46 ("Once the refund is processed, Mepco is made whole and actually benefits from having shortened the duration of its advance to the Seller and Administrator . . . .").  The Counterclaims allege that Mepco acted out of economic self-interest; those allegations do not support the inference that Mepco acted for the sole purpose of harming DOWC.

### d.  Tortious Interference with Contract

DOWC has not pleaded a claim for tortious interference with the Service Contracts because they are terminable at will by purchasers; hence, DOWC cannot demonstrate that their cancellation by purchasers constitutes a breach of contract.  Under New York law, the elements of a claim tortious interference with contract are "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).  "A contract terminable at will cannot be the basis for a tortious interference with contract claim." *AIM Int'l*

*Trading, L.L.C. v. Valcuine S.p.A.*, No. 2-cv-1363, 2003 WL 21203503, at *5 (S.D.N.Y. May 22, 2003) (collecting cases). A claim regarding interference with a contract that is terminable at will is treated as a claim for interference with prospective contractual relations. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 192 (1980) ("[W]e are persuaded that interference with performance of voidable contracts should be treated the same as interference with contracts terminable at will for purposes of imposing liability in tort, and that both fall in the same category with interference with prospective contractual relations.").

Purchasers are permitted to terminate their respective Service Contracts at any time. Service Contract ¶ 4. Therefore, DOWC cannot sustain a claim for tortious interference with contract with respect to them—instead, it is limited to a claim for interference with prospective contractual relations. This result makes eminent sense. In order to plead tortious interference with contract, DOWC must allege that Mepco caused the purchasers to breach their Service Contracts. Because purchasers have an unconditional right to cancel their Service Contracts, their choice to do so does not constitute a breach of contract. Therefore, DOWC cannot plead a claim for tortious interference with contract with respect to the Service Contracts because Mepco's conduct led purchasers to cancel their contracts.

## V. LEAVE TO AMEND

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave [to amend] when justice so requires." "Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). Any amendment to DOWC's claims for declaratory judgment in its favor to conclude that it has the right unilaterally to terminate or amend the Payment Plan Agreements would be futile, because the text of

the Payment Plan Agreements precludes that conclusion.[20]  Similarly, it would be futile for DOWC

to amend the claims related to the implied covenant of good faith and fair dealing because the text

of the relevant agreement does not support the rights that DOWC asserts to be implied in it.

Because the Service Contracts are terminable at will, it would be futile for DOWC to replead its

claim of tortious interference with those contracts.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.

2000) (holding that where the "problem with [a complaint] is substantive [and] better pleading will

not cure it," leave to amend should be denied as futile).  However, the Court grants DOWC leave to

replead the dismissed counterclaim for tortious interference with prospective economic advantage.

Any amended counterclaim must be filed no later than fourteen days from the date of this order.

## VI.    CONCLUSION

For the reasons stated above, Mepco's motion to dismiss DOWC's Counterclaims is

GRANTED.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 52.

SO ORDERED.

Dated:  January 3, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[20] This conclusion relates only to Payment Plan Agreements, as defined in this agreement.  The Court takes no position regarding any payment plan agreements entered into by Mepco with purchasers that do not conform to the form agreement presented to the Court in the Counterclaims.